### UNITED STATES of America, Plaintiff-Appellant,

v.

### The INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL UNION NO. 520 et al., Defendants-Appellees.

No. 72–1524.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 26, 1973.

Decided April 18, 1973.

Henry A. Schwarz, U. S. Atty., East St. Louis, Ill., David L. Norman, Asst. Atty. Gen., Frank Petramalo, Jr., Atty., U. S. Dept. of Justice, Washington, D. C., for plaintiff-appellant.

Harold Gruenberg, St. Louis, Mo., for defendants-appellees.

Before SWYGERT, Chief Judge, and STEVENS and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

This appeal constitutes another chapter in the attempt to implement equal employment opportunities in the highway construction industry in Madison and St. Clair Counties, Illinois.

In United States v. United Brotherhood of Carpenters and Joiners of America, Local 169, 457 F.2d 210 (7th Cir. 1972), we held that the carpenters' union, one of the six principal craft unions involved in highway construction (teamsters, laborers, carpenters, cement masons, ironworkers and operating engineers) had engaged in past discrimination; that courts have the power and duty to eliminate the vestiges of past discrimination; that the carpenters' union was bound to comply with a State-of-Illinois-promulgated plan (Ogilvie Plan) intended to implement employment rights guaranteed by Title VII of the Civil Rights Act of 1964; that part of the carpenters' union's past discrimination stemmed from a "jump-up" referral system which resulted in few blacks being referred out for jobs; and that the district court should fashion appropriate relief, considering "in view of any further evidence he may wish to hear, the requirement of improvements in the hiring hall referral system, possibly on a first-in, first-out basis" 457 F.2d at 221.

In Southern Illinois Builders Association v. Ogilvie, 471 F.2d 680 (7th Cir. 1972), we held that the Ogilvie Plan was constitutional; that the three unions attacking the plan in that case (operating engineers, ironworkers and cement masons) had engaged in discrimination in the highway construction industry in Madison and St. Clair Counties; that those unions had entered consent decrees which compelled them to cooperate with the Ogilvie Plan; and that the obligation to take affirmative action in regard to equal opportunity employment "imports more than the negative obligation not to discriminate."

The present phase of the problem arises as a result of the district court's refusal to modify the consent decree re-

lating to operating engineers and the dissolution of the decree by the court on April 3, 1972.

This cause was instituted against the operating engineers by the Attorney General on behalf of the United States on January 17, 1969, seeking relief for alleged violations of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) and for interfering with the implementation of Presidential Executive Order 11246, which forbids racial discrimination in employment opportunities. Thereafter, on May 13, 1969, the parties settled the case by entering into a consent decree which was approved by the district court. Under the terms of the decree, a regular referral list on which applicants were assigned permanent seniority numbers, based on the length of service under the collective bargaining system, was compiled. The applicant with the lowest permanent number was given preference for job opportunities over other members. The decree also provided that the operating engineers shall "cooperate with any . . . government agency in the establishment and operation of any apprenticeship, skill improvement, or on-the-job training programs . . . and . . . shall exercise all efforts to see that such programs are operated in a nondiscriminatory manner." The Ogilvie Plan, which provided a program for the recruitment, placement and training of minority group members in the highway construction industry, was promulgated on June 3, 1970.

The operating engineers' consent decree also provided that "on or after April 1, 1971, defendant may move for the dissolution of this decree and, unless plaintiff shows good cause otherwise, the decree shall be dissolved at that time." On May 18, 1971, the operating engineers moved to dissolve the consent decree. On June 4, 1971, the government moved to modify or supplement the decree on the ground that the referral system provided for in the decree perpetuated past discrimination and praying for "a referral system based on a first in, first out method of referral, whereby applicants register and are referred out in a rotating order as work becomes available, or some other referral system which does not perpetuate past discriminatory practices."

An evidentiary hearing with respect to the two motions was held on November 22, 1971. The evidence showed that in 1968 the operating engineers had 1124 members in construction work and none were black.[1] At the time of the hearing the union membership had increased to about 2000 members of whom 90 were black. However, the seniority roster used for work referral purposes listed equipment operators in chronological order based on their length of experience under the bargaining agreement. The list showed the first black operator as No. 1192. The majority of blacks were concentrated in the 1700 through 2000 number range.

The district court found as a result of the evidentiary hearing that "the union entered into a 'gentlemen's agreement' whereby it would provide employment opportunities to 20% in the aggregate of referrals to highway construction to be taken from minority applicants." Union records kept during a period (April 1–June 30, 1971) when the "gentlemen's agreement" was in effect showed that (1) 8% of union referrals were of black members, resulting in jobs 77% of the time; (2) 92% of union referrals were of white members, resulting in jobs over 99% of the time; (3) the average length of jobs was favorable to blacks (10.31 days) as opposed to whites (9.06 days) but of 327 referrals of jobs expected to last all summer 304 went to white and 23 to black applicants.

The district court concluded in its order of April 3, 1972 that "[t]he

1. In 1970, black persons constituted 22.4% of the population of St. Clair County and 69.2% of the population of East St. Louis, the principal metropolitan area in St. Clair County.

'gentlemen's agreement' by which the union agreed to be bound provides definite affirmative action to correct the alleged evils which were the basis for the action being filed initially."

It is clear from the record that past discrimination by the operating engineers would be perpetuated by the "regular" referral system specified in the original consent decree. While the union may be in utter good faith in maintaining the so-called "gentlemen's agreement," it is too casual and indefinite a way to assure the affirmative action required to eliminate past discrimination. In United States v. International Brotherhood of Electrical Workers, Local No. 38, 428 F.2d 144, 151 (6th Cir.), cert. denied, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970), Judge Edwards said:

"As we have indicated, after this suit was filed by the Attorney General, but before trial, a new administration was elected to office in Local 38. The District Judge found that the new officers favor voluntary compliance with the Civil Rights Act of 1964 and have taken steps to bring past discriminatory practices to an end. These facts, however, do not in our opinion warrant the District Court's refusal to retain jurisdiction of this case or its refusal of affirmative relief. The record of compliance is very brief—particularly as compared to the long record of discrimination—and even that record has been written under the impact of this litigation. . . . Assuming, as the District Judge plainly did, and as we do, that the new leadership is in utter good faith, it has no mean task ahead in eliminating ingrained discriminatory practices of past decades. In many respects a more specific court order, plus retention of jurisdiction, might serve to support

the stated objectives of the new administration of Local 38. And, in any event, such relief is authorized by the Act and called for in this record."

We conclude that the dissolution order of April 3, 1972 should be vacated, and that the consent decree entered on May 13, 1969 should be reinstated, except that the court shall determine in what manner paragraph 4 thereof shall be modified[2] to incorporate a plan of referral which will dissipate the effects of past discrimination. The district court should consider, in view of any further evidence it may wish to hear, whether this objective can only be achieved through some first-in, first-out or other type of referral basis or whether it can be satisfied by formal incorporation in the reinstated consent decree of the terms of the "gentlemen's agreement" or some modification thereof.

Judgment vacated and remanded for further proceedings.

2. The fact that the Ogilvie Plan became effective after the consent decree was originally entered, and the experience thereunder, including the "supplementary list" for referrals within East St. Louis, which was superseded by the "gentlemen's agreement," convince us that the referral provisions of the original decree must be reexamined by the district court in the light of that experience in order to eliminate past discrimination by affirmative action.